**CAMERON COUNTY GOOD GOVERNMENT LEAGUE, et al., Appellants,**

v.

**Ray RAMON, et al., Appellees.**

**No. 8627.**

Court of Civil Appeals of Texas, Beaumont.

June 4, 1981.

Rehearing Denied July 9, 1981.

Orrin W. Johnson, Jim Denison, Paul C. Greenwood, Harlingen, for appellants.

E. R. Fleuriet, Brendan J. Hall, Jr., Harlingen, Hector Yznaga, Brownsville, Mary Joe Carroll, Austin, for appellees.

DIES, Chief Justice.

Plaintiffs below, Cameron County Good Government League, Gustavo Barrera, and Orrin W. Johnson sued Cameron County Judge Ray Ramon, and others, as defendants, for injunctive and declaratory relief. Plaintiffs alleged various violations (hereafter discussed) by the Cameron County Commissioners' Court. Trial was to the court, without a jury. After plaintiffs rested their case in chief and without hearing any evidence from defendants, the court granted defendants' motions for judgment. From this judgment, plaintiffs have perfected this appeal. The parties herein will generally be referred to as they were below or by name.

In a written opinion, the trial court, while finding many of the acts of the Commissioners' Court were "ill advised," found that plaintiffs failed in their burden of proving such orders were not reasonably supported by substantial evidence.

■ In a non-jury trial, when the plaintiff rests, the defendant may move for judgment, and the court applies to such motion the same rules which would determine the propriety of instructing a jury to return a verdict. *Casey v. Sanborn's, Inc. of Texas*, 478 S.W.2d 234, 236 (Tex.Civ.App.—Houston [1st Dist.] 1972, no writ); 4 R. McDonald, *Texas Civil Practice* § 16.04 (rev. 1971). Plaintiffs, therefore, are entitled to the most favorable construction that the evidence they produced will bear and to the benefit of all reasonable inferences arising therefrom. *Rhinetubes, Inc. v. Norddeutscher Lloyd*, 335 S.W.2d 269 (Tex.Civ. App.—Houston 1960, writ ref'd n. r. e.); *Evans v. Houston Printing Corporation*, 217 S.W.2d 85 (Tex.Civ.App.—Galveston 1948, writ ref'd n. r. e.).

Basically, plaintiffs contend defendants violated statutory requirements or failed to observe specifications required in the following categories:

1. In including Comprehensive Employment and Training Administration Employees (CETA) in a county group insurance contract without first seeking competitive bids.

2. In awarding a contract for the purchase of caliche road material in violation of county specifications.

3. In holding meetings of the Commissioners' Court in violation of the Texas Open Meetings Act, *Tex.Rev.Civ. Stat.Ann. art. 6252–17* (1970).

4. In purchasing four fire trucks without full compliance with the competitive bidding requirements.

### C.E.T.A.—Group Insurance Award

On August 27, 1979, the Cameron County Commissioners' Court ("Court") awarded a group insurance contract covering the county's Comprehensive Employment and Training Administration ("CETA") employees to defendant Occidental Life Insurance Company ("Occidental"). The other county employees were covered previously by Occidental. The Court extended the contract to the CETA employees because the County Judge said it had been the Court's intention to include all county employees under the health insurance for employees. CETA is a federally funded Manpower Training Agency of the county under regulations of the Department of Labor requiring, among other things, competitive bidding of contracts.

Selden Snedeker, the District Attorney for Cameron County, testified he informed the Commissioners' Court that the competitive bidding law requires that the contract bid be given to the lowest responsible bidder. After this particular contract bid was accepted, he advised the Court to "rebid the contract."

He also advised the County Judge that the county must comply with the "procurement statute." The County Judge responded that the contract had already been let.

Charles Willette, attorney for CETA in August 1979, testified he advised rejecting all the bids and rebidding the entire health plan with the CETA employees added on it. He saw a letter from the district attorney to the County Judge stating that if the CETA insurance bid exceeded ten thousand dollars—which he knows it did—to follow government bidding requirements. He definitely advised that if the CETA employees were not included in the first bid "that definitely the group policy should be rebid, period. And, that is exactly what P–X 81 says...."

The August 27, 1979, meeting of the Court minutes reflect it had been the Court's intention to include all county employees under the health insurance for employees, and, since Manpower employees (CETA) were not regarded as county employees, they should not be included.

Kenneth Lieck—County Purchasing Agent—said that in the bid package for group and health insurance, CETA employees were not included. Prior to CETA employees inclusion in the Occidental policy,

CETA employees were covered by another policy and the "CETA staff was satisfied with their policy."

D. J. Lerma, County Commissioner, testified that when Occidental was given the award for inclusion of CETA employees, it was done without a bid.

Michael Puckett, County Treasurer and Chairman of the Insurance Committee, said that in 1979 the committee recommended Blue Cross-Blue Shield, but that the Court chose Occidental which was the highest bidder. He also felt that the bid specifications were designed for Occidental's plan.

Bill Posey also testified that Occidental was the highest bidder in 1980, but received the bid. He said that including the CETA employees should help make the rates lower and had their 1979 bid included CETA employees their bid would have been lower.

Daniel Downs was Director of Personnel with CETA in 1976. He testified he resigned because the award to Occidental was "without advertising for bids."

*Caliche*

The 1979 county bid specifications required, with respect to bank run ("Item B") caliche material, that it shall be screened, and oversize shall be crushed and returned to the screen material again in such manner than a uniform product will be produced. "Item A" caliche material was required by county specifications to pass through a one and three-fourths inch sieve or screen.

Plaintiffs produced much evidence to show irregularities in the purchase of caliche for the county roads.

Jack Langley, a laboratory owner, tested caliche from the pit which supplied the county. He said the county's specifications called for "a more refined product," which this was not. The evidence shows that two types of caliche were purchased, A and B.

Jessie W. Gothard, a lab technician, tested the caliche and testified, "B passed and A didn't." He further said, "It was out on the No. 40 sift."

Julia Monsees cast doubt on the quality and size of the caliche saying, "It looked more like sand and huge boulders." The witness put reflectors on the road because of an accident when a lady hit a large boulder. The witness recounted another accident where a man hit a boulder which turned over his vehicle.

John Frank Phillips, Jr., prior General Manager for Valley Materials Transport and acquainted with caliche, explained the necessity of putting crushed and uniform caliche on a road, and the danger of failing to do so. He inspected some county roads and was not satisfied with the caliche he saw. Examining the county specifications, he concluded some of this caliche did not conform to the specifications. He went through several tests reported by laboratories on caliche and found that they all failed when compared to the county specifications.

Mr. Luis De La Rosa, a realtor, testified to many large rocks on "Breedlove Road." They were not crushed. He had experience with caliche crusher.

Daniel T. Hinojosa testified that the caliche account with Cameron County was indeed substantial in sum of money.

David Crowder, reporter for the Brownsville Herald, inspected the "Monsees Road" and saw a large number of rocks "which could not pass a one and three-quarter inch screen."

David Gelfer inspected a county road and found many large caliche rocks on it. He said, "I've been over that road and some other roads in that area and it's a fair accurate description of the roads in that area that I've been over."

John L. Boughton also had observed large rocks on the roads that had not been crushed.

Adolfo De La Fuente also inspected two county roads and saw rocks which had not passed through a one and three-quarter inch screen.

Raul Tijerina, Jr., a rancher and co-owner of the pit from whence the county caliche came, testified, "The material . . . supplied . . . was uncrushed and unscreened. . . ."

Daniel P. Hinojosa, a partner in the firm which sold the caliche to Cameron County, admitted the material was not crushed. He said, "I've never seen a crusher." He also admitted delivering some wet caliche to the county (which weighs more per yard).

The county auditor testified that from April 30, 1979, until March 1980 the supplier of the caliche was paid $474,964.38 for type A and B. He said federal guidelines require compliance by state officials with state law in using federal funds.

Mr. O'Bell of the County Judge's office stated in one of the Court meetings that he was aware that number two material being received was not meeting specifications "and that he had let it go on because he knew they were small companies and they needed the business."

Kenneth Lieck, the County Purchasing Agent, testified that under the original specifications only one bidder made the grade; not C & H which got the award for the caliche. He said that in 1979 Cameron County had gone to the consolidated road system. He took some samples from the pit where the county got the caliche for testing. They did not meet specifications.

Gary E. Putt also testified that tests on the county caliche did not meet the county specifications.

Tony Lisaukis, a TV news reporter, showed a video tape he had taken of a county road and described the many large rocks in the road.

Daniel Downs also testified to the large amounts of large rocks on county roads. On one occasion he mentioned to the Commissioners that they were laying quite a few large rocks. The reply was, "Yes, the rocks were large." The witness brought several of the rocks to the courtroom. Others were too heavy for him to lift.

### Open Meetings

Section 3A(h) of Article 6252–17, Tex. Rev.Civ.Stat.Ann. (Supp.1980–1981), to the extent pertinent here specifies that:

"Notice of a meeting must be posted in a place readily accessible to the general public at all times for at least 72 hours preceding the scheduled time of the meeting, except that notice of a meeting of a state board, commission, department, or officer having statewide jurisdiction other than the Industrial Accident Board or the governing board of an institution of higher education, must be posted by the Secretary of State for at least seven days preceding the day of the meeting. In case of emergency or urgent public necessity, which shall be expressed in the notice, it shall be sufficient if the notice is posted two hours before the meeting is convened. Provided further, that where a meeting has been called with notice thereof posted in accordance with this subsection, additional subjects may be added to the agenda for such meeting by posting a supplemental notice, in which the emergency or urgent public necessity requiring consideration of such additional subject is expressed."

The plaintiffs also contended the Commissioners' Court frequently did not comply with the Texas Open Meetings Act, often calling "emergency" meetings on two hours notice for matters that weren't emergency in nature or adding matters to the agenda after the notice was posted.

The witness George Handley, a member of the news media, testified concerning the two-hour emergency notices saying, "We quite frequently didn't manage to attend." He said they were poorly attended.

Robert L. McDonald related he objected to the County Judge about the number of emergency meetings saying, "[They] aren't of an emergency nature." The judge replied, "Yes, you're probably right about that. We should have better control of that."

A reporter covered the Commissioners' Court and knew that notices less than 72 hours made it difficult for people to attend. Emergency meetings brought far fewer members of the public, and he said there were even meetings which were given less than two hours notice; that emergency meetings on supplemental notices posted on the bulletin board were common. There

was one when the notice went up after the courthouse door was closed for a meeting the next morning. The notice was posted inside the courthouse and contained eighteen supplemental items. He recalled another incidence (November 26) where two supplemental agenda were posted, one of which was posted on "the same day of the meeting, giving actually less than 2 hours notice of the matter to be taken up." It was underneath a notice posted prior to that time. He said that actions were taken by the court not of emergency nature.

The county auditor was shown emergency notices listing claims owed to be taken up by the Court, and he was asked if it was an emergency to consider them with less than seventy-two hours notice. He responded, "I would say, in my opinion, there [were] no claims listed on this one that required an emergency inasmuch as many of them had been there for 21 days in their possession."

William C. Young, a reporter with KGBT TV, said emergency meetings made it difficult for his media to cover and were poorly attended.

Mr. Adolph Tomae, Jr., a County Commissioner for over fifteen years, himself, had missed emergency meetings because of lack of notice and had repeatedly protested the emergency meetings to the Court where no emergency was involved.

### Fire Trucks

*Tex.Rev.Civ.Stat.Ann. art. 2368a, § 2(b)(1)* (Supp.1980–1981), amended, requires a county acting through its Commissioners' Court to submit all contracts for more than Three Thousand Dollars ($3,000.00) to competitive bids.

*Tex.Rev.Civ.Stat.Ann. art. 2351a–1* (1971) also requires Commissioners' Courts to purchase fire trucks by competitive bids.

Plaintiffs also complained of the bidding process for fire trucks in 1979. The complaint was that insufficient notice was given and that the notice was for the purchase of one fire truck whereas, in fact, the Commissioners' Court purchased four. The newspaper notice did, in fact, indicate one fire truck would be purchased.

Gary Guenzel of the Guenzel Metal Products in Harlingen had forty-four years experience manufacturing truck bodies including fire trucks. While he usually got a bid from the city he received no bid or specifications for the fire trucks which the county purchased.

Matias D. Garcia, Civil Defense Director for Cameron County and Clerk for the Fire District, testified the successful bidder for the four fire trucks was "Say-so." He said one of the trucks was in possession and used by the county at the time the bid was awarded.

■ In view of the above summarized evidence produced by the plaintiffs, we believe the trial court erred in granting defendants a judgment at the conclusion of plaintiffs' evidence. *Casey v. Sanborn's, Inc. of Texas,* supra, and 4 R. McDonald, *Texas Civil Practice* § 16.04 (rev.1971).

Since, in our view, this cause must be remanded for a full trial, many of defendants' contentions will not again arise. For those we feel will arise, we now address:

Defendants contend that the substantial evidence rule applies to decisions of the Commissioners' Court, citing, among others, *Moncrief v. Tate,* 593 S.W.2d 312 (Tex. 1980), and *Mobil Oil Corp. v. Matagorda County Drainage District No. 3,* 580 S.W.2d 634 (Tex.Civ.App.—Corpus Christi 1979) rev'd and ren'd, 597 S.W.2d 910 (Tex.1980).

In *Moncrief,* former civil service employees brought suit against the county officials seeking reinstatement of their positions as janitorial custodians and seeking back pay. The court held (593 S.W.2d at 314):

"In so doing we reaffirm what was stated to be the preferable approach in *Wallace* [*City of San Antonio v. Wallace,* 161 Tex. 41, 338 S.W.2d 153 (1960)]; namely, that the issue of good faith in abolishing a civil service position presents a question of an abuse of discretion by the governing board of the municipality which is a question of law for the decision of the judge."

In *Mobil Oil* ([580 S.W.2d 634] at 638) the Corpus Christi Court said:

"The supervisory power of the district court over the judgments of a Commissioners Court can only be invoked when such court acts beyond its jurisdiction or clearly abuses the discretion conferred upon it by law. [citing authorities] This supervisory jurisdiction can be invoked in a direct attack in the district court when it is alleged that the Commissioners Court order is voidable as being arbitrary, capricious, unsupported by substantial evidence or that the court has acted beyond its jurisdiction." (citing authorities)

And, see *Live Oak County v. Lower Nueces River Water Sup. Dist.*, 446 S.W.2d 14, 22 (Tex.Civ.App.—Beaumont 1969, writ ref'd n. r. e.), where it is stated:

"No principle of law is better settled than that acts of discretion and findings of fact on the part of public officers to which such power is confided, including Commissioners Courts, will not be reviewed on appeal."

■ The correct rule is, we think, in determinations of fact and in discretionary determinations, judicial review of acts of the Commissioners' Court is limited to finding the existence of substantial evidence or to ascertain whether the action taken was arbitrary or capricious. 2 Am.Jur.2d *Administration Law*, § 615 at 459 (1962); Reavley, *Substantial Evidence and Insubstantial Review in Texas*, 23 Sw.L.J. 239 (1969).

But, where a Commissioners' Court does not abide by a competitive bidding statute, fails to observe county specifications, or otherwise does not observe requirements enacted by the Legislature, the substantial evidence rule is not involved.

See 2 Tex.Jur.3rd, *Administrative Law*, § 80 at 288 (1979):

"The substantial evidence rule is inapplicable where the administrative decision or order pertains to a matter the legislature has not committed to the agency's discretion or judgment, or where the statute, properly construed, requires the court to substitute its own judgment as to both the law and the facts."

And, see *J. D. Abrams, Inc. v. Sebastian*, 570 S.W.2d 81, 84–85 (Tex.Civ.App.—El Paso 1978, writ ref'd n. r. e.):

"The Defendants contend that the Ordinance allows an appeal only in the event the substantial evidence standard was violated, and, unless such a violation occurred, the appeal is without merit. This contention ignores the rule that the substantial evidence test is not applicable in instances where the attack on the administrative agency's order is made on the basis that an essential notice as called for in the administrative process was not made."

See also, *Rowan Oil Co. v. Texas Employment Commission*, 152 Tex. 607, 263 S.W.2d 140, 142 (1953); *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935, 941 (1935) mot. reh. den. per curiam, 87 S.W.2d 1069 (1935); *Railroad Commission v. Shell Oil Co.*, 139 Tex. 66, 161 S.W.2d 1022, 1025 (1942).

Defendants also contend plaintiffs had no standing to enforce the Open Meetings Act, and that the question of "emergency" or "urgent public necessity" is not subject to judicial review.

■ Our record contains many "emergency meetings" by the Commissioners' Court, and the plaintiffs certainly produced evidence that many of these were not "emergencies" or "urgent public necessity" at all. Do plaintiffs have standing to contest these decisions? We hold they do.

*Section 3* of the Texas Open Meetings Act (Supp.1980–1981) provides:

"*Any interested person*, including bona fide members of the news media, may commence an action either by mandamus or injunction for the purpose of stopping or preventing violations or threatened violations of this Act by members of a governing body." (Emphasis supplied.)

It is difficult to see how the Legislature could broaden the class of "any interested person." Defendants' reliance on *Scott v. Board of Adjustment*, 405 S.W.2d 55 (Tex. 1966), is misplaced. The court (at 56) said:

"Within constitutional bounds, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review on behalf of the public without proof of particular or pecuniary damage peculiar to the person bringing the suit."

See also *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597 (Tex.1915), discussed in *Scott.* See also *Lower Colorado Riv. Auth. v. City of San Marcos*, 523 S.W.2d 641, 646 (Tex. 1975). Defendants cite *City of Abilene v. Shackelford*, 572 S.W.2d 742 (Tex.Civ.App. —Eastland 1978). But, this case was reversed in 585 S.W.2d 665 (Tex.1979).

To contend that a governing body has unbridled power to decide what is an emergency under the Open Meetings Act flies in the teeth of *Section 3* (1970) which specifically allows judicial review "for the purpose of stopping or preventing violations or threatened violations of this Act." Such a holding would effectively emasculate the Act and thwart the intentions of the Legislature as expressed in the Caption of the bill (Acts 1967, 60th Leg. Ch. 271, p. 597):

"An act to prohibit governmental bodies from holding meetings which are closed to the public...."

And as expressed in the emergency clause (Section 7):

"The importance of assuring that the public has the opportunity to be informed concerning the transactions of public business...."

Nor are we impressed with the argument that a governmental body may substantially comply with this Act. We have found no case in this State holding that the substantial evidence rule should or could be applied to notice of hearing. We believe our Legislature intended for a literal compliance with the Act. Subsequent amendments since its original passage strengthen this belief.*

In fact, the Administrative Procedure Act, *Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e)* (Supp.1980–1981), lists as bases for reversal for trial under the substantial evidence rule a judicial finding that the administrative order is:

"1.  in violation of constitutional or statutory provisions;

2.  in excess of the statutory authority of the agency;

3.  made upon unlawful procedure;

4.  affected by other error of law;

5.  not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

6.  arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

The court dismissed from the case these defendants: Mobile Video Tapes, Inc., Freedom Newspapers, Inc., The Brownsville Herald, Valley Morning Star, The McAllen Monitor, Southwest Medical Corporation, and Jim Cason. None of these defendants had filed an answer. None were necessary to the relief plaintiffs sought. We find no error in this action.

In view of what we have said in this opinion, and its holding, it is unnecessary to discuss defendants' cross-points, and they are all overruled.

The judgment of the trial court is reversed, and the case is remanded for a new trial.

**REVERSED and REMANDED.**

---

* Acts of 1969, 61st Leg. Ch. 227, p. 674, notice provisions.

Acts of 1971, 62nd Leg. Ch. 527, p. 1789, strengthening notice provisions.

Acts of 1975, 64th Leg. Ch. 367, p. 968, requiring notice posting "in a place readily accessible to the general public ... at least 72 hours preceding ... meeting."

Acts 1979, 66th Leg. Ch. 449, p. 1015, making it clear members of the news media had standing to enforce the Act. (See *City of Abilene v. Shackelford*, 572 S.W.2d 742 (Tex.Civ.App.— Eastland 1978), reversed, 585 S.W.2d 665 (1979).